RENDERED: SEPTEMBER 12, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1488-ME

BRADLEY ALAN SEARS                                      APPELLANT

                     APPEAL FROM MCCRACKEN CIRCUIT COURT
v.                         FAMILY COURT DIVISION
                 HONORABLE JASON S. FLEMING, SPECIAL JUDGE
                       ACTION NO. 24-D-00100-001

HEATHER BRYANT                                     APPELLEE

AND

NO. 2024-CA-1490-ME

BRADLEY ALAN SEARS                                      APPELLANT

                     APPEAL FROM MCCRACKEN CIRCUIT COURT
v.                         FAMILY COURT DIVISION
                 HONORABLE JASON S. FLEMING, SPECIAL JUDGE
                       ACTION NO. 24-D-00099-001

DANIELLE GUMINSKI                                    APPELLEE

** ** ** ** **

BEFORE:  COMBS, EASTON, AND LAMBERT, JUDGES.

EASTON, JUDGE:  Bradley Alan Sears ("Brad") appeals from the McCracken Family Court's issuance of two Interpersonal Protective Orders ("IPOs") against him on behalf of the Appellees, Heather Bryant ("Heather") and Danielle Guminski ("Danielle").  Because these cases involve the same Appellant and related facts, the appeals have been consolidated, and both will be addressed in this Opinion.  In both cases, Brad argues the family court's findings of fact are clearly erroneous, there was a lack of substantial evidence to support the issuance of the IPOs, and the family court abused its discretion in issuing the IPOs against him. We conclude the family court did not abuse its discretion, and its findings were not clearly erroneous.  Thus, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Heather and Danielle are ex-girlfriends of Brad.  Danielle and Brad dated from February 2023 through May 2023.  Both Danielle and Brad agreed in their testimony that they have had no contact with one another since May 2023. Heather and Brad dated off-and-on from August 2023 to October 2023, then dated from December 2023 until March 2024.  While the scope of their relationship was not completely agreed upon by Brad and Heather, both agree the relationship

-2-

ended on March 12, 2024. Prior to their respective relationships with Brad, Heather and Danielle did not know one another.

Both women filed IPO petitions on May 10, 2024, and emergency IPOs were granted the same day. The family court judge assigned to the case recused, and a special judge was appointed, who heard both cases together. Hearings were held on July 30, 2024, August 14, 2024, and concluded on September 11, 2024.

Both women testified that during their relationships with Brad, he would go into a rage, particularly when talking about an ex-partner, or someone whom he perceived as having wronged him. He would regularly speak about wanting to harm or kill others, including his children's mother ("Zorine"), and call them "psychos," "unhinged," and that they "didn't deserve to breathe the same air" as he did.

Both testified he had a "kill list" that included Zorine, her attorney, and several judges (including the family court judge who recused from these cases). They both testified Brad had firearms in his home that he would retrieve when he was angry. Danielle also spoke about the multiple knives he kept around his house. She described them as "not just kitchen knives; they were scary, serrated knives."

Heather and Danielle both testified that, when Brad went into these rages, he was terrifying to be around. He would scream and curse, he would clench his teeth, wave his arms around, and pace around the room. Heather testified he made threats of going on a "killing spree."

Heather testified to a specific event, which occurred on February 29, 2024. Brad had just been released from jail (for violating a condition of release relating to a DVO[1] against Brad by Zorine). A friend of Brad's called Heather to come over, because she said Brad was suicidal. When Heather arrived, Brad had two firearms out, but he eventually calmed down and put them away.

Heather testified that days later, on March 2, 2024, Brad went into one of his rages about Zorine, and he took out his firearms again. While she was in another room, she heard the shotgun go off. She ran screaming into the room he was in, and he said: "you thought I just killed myself, didn't you?" Brad then laughed at her. Heather stated that, later that same evening, Brad cut himself with a knife and was rocking back and forth. She also said Brad was paranoid; he believed the sheriff's department had put a tracker on his vehicle when he was released from jail.

Prior to this incident, in February 2024, Heather testified that Brad dared her to get Danielle fired from her job. Danielle is a nurse practitioner, and

---

[1] Domestic Violence Order.

Heather only knew her from what Brad had told her and from social media posts. Heather testified that Brad had typed up a complaint against Danielle in the past, but he had never sent it. The complaint stems from some of Danielle's social media posts.

Heather made an anonymous complaint to the Kentucky Nursing Board about Danielle. Heather also spoke with Danielle's supervisor at her job. Heather told the supervisor that she believed Danielle was using patients' private information inappropriately and violating HIPAA.[2] Heather testified she never would have made the complaints if Brad had not told her to do so, and she later apologized to Danielle for making the false complaints.

Despite Danielle and Heather testifying that Brad's fits of rage were terrifying, they both agreed that he never physically harmed them or directed his threats at them while they were in a relationship with him. Heather testified that, although she was afraid the night she believed Brad had shot himself, her real fear emerged after the relationship ended. She referenced a text message when Brad called her "unhinged" and a "psycho." Heather said she then realized she had become part of his pattern where he threatened those who he believed had wronged or scorned him. Brad had referred to all his ex-girlfriends in this way, and she

---

[2] Health Insurance Portability and Accountability Act.

believed she was now in that category of people who he wanted to harm. It was at this point that Heather began to truly fear for her safety.

Danielle testified that she was afraid of Brad because of the threats he made toward others. He had also made a threat to her that he would "destroy her" by getting her nursing license taken away. She testified that after their relationship ended, she put up cameras outside her home and obtained several weapons, including a gun, for protection. Danielle said that while they were dating, Brad made several references to having Zorine, her mother, her attorney, and several judges "taken care of." Brad said he had a friend from Kansas City who would do it for him.

When asked why Danielle did not file for protection for a year after having no communication with Brad, she stated that she became afraid when the nursing complaint was filed. She knew Brad was responsible for the complaint, and she realized that she was still "on his radar" after this lengthy period. She had heard about his other DVOs and his subsequent arrest, and she believed him to be "spiraling." This led her to believe that he still held a grudge against her and would come after her, even after no contact for almost a year. Danielle stated one of his last messages to her was "enjoy your nursing license."

Danielle admitted she and Heather did speak about filing for IPOs before they did so. This conversation occurred around May 6, 2024, which was the

last date Heather had any communication with Brad. They decided to wait until May 10 to file their petitions, because Brad had his children with him until then. They wanted to wait until the children were returned to their mother, because they were concerned about the children's safety if Brad was served with IPO petitions while the children were present.

Brad began his testimony by stating he and Heather were never really in a relationship. He stated he told her on many occasions that he did not want a relationship with her. He believes she wanted a relationship with him, and that this IPO was retaliation for his ending things with her.

Brad denied making any threats against anyone. He denied making any statements about wanting to harm or kill anyone. He testified he and Zorine have a good co-parenting relationship, and that they have an equal parenting schedule. He stated he has never made threats against any judges, and he claims he has not appeared in front of the judge on his alleged "kill list" in several years. He also denied owning any firearms, and he disputed that the events Heather testified to about a shotgun going off and his cutting himself ever occurred. He did confirm he was arrested and was very upset when he was released due to the circumstances, but he rejected Heather's testimony that anything out of the ordinary had occurred after he returned home. He denied ever being suicidal.

Brad admitted into evidence many text messages between him and Heather in which she was very complimentary of him. Some of these messages occurred after the time frame in which Heather claimed she became afraid of Brad. As for the nursing complaint against Danielle, he claims he did not seriously dare Heather to do it. He claims their game of "truth or dare" was a joke. He never expected Heather to take it seriously or file any type of complaint. Yet he admitted he had typed up a complaint previously and had kept the document saved, but he never filed it.

Brad alleges Danielle was the one who kept posting about him on social media long after their relationship had ended. He claims he wanted nothing to do with her. He just wanted her to leave him alone.

Brad testified to an event that took place on May 1, 2024, in which he and his girlfriend (now wife) ("Kayla") saw Heather at a doctor's appointment. Brad and Kayla were there to confirm her pregnancy. Heather initially sat directly across from them and stared at them, while talking on her phone loudly about them. Heather then approached them and asked Brad if he had her things. She then made a comment loudly about Brad getting two women pregnant in the same month. Heather had previously told Brad she was pregnant, but that the pregnancy was not viable, and she had miscarried.

Kayla talked about this confrontation, and she claimed Heather made her very uncomfortable. Kayla testified that Heather did not appear to be afraid or apprehensive of Brad at all, because she approached them. She said Heather appeared upset but not afraid.

Brad ended his direct testimony by again stating he had never made any threats against anyone. He stated he had no reason to contact either Heather or Danielle, and he wanted nothing to do with either of them. He believes this is a coordinated effort between Heather and Danielle to get revenge on him.

On November 15, 2024, the family court entered a written order granting the IPOs in favor of Heather and Danielle against Brad for a period of two years. The family court determined both relationships qualified as dating relationships, and the court deemed Heather and Danielle to be credible. The court ruled Brad's actions qualified as domestic violence and abuse, and his actions showed a pattern. Further facts and testimony will be addressed below as they become relevant to our analysis.

## STANDARD OF REVIEW

A review of a trial court's decision regarding the entry of an order of protection is limited to "whether the findings of the trial judge were clearly erroneous or that he abused his discretion." *Caudill v. Caudill*, 318 S.W.3d 112, 115 (Ky. App. 2010). "Abuse of discretion occurs when a court's decision is

unreasonable, unfair, arbitrary or capricious." *Dunn v. Thacker*, 546 S.W.3d 576, 578 (Ky. App. 2018). A trial court's factual findings are not clearly erroneous if supported by substantial evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

## ANALYSIS

Kentucky's IPO statute is relatively new, being enacted by the legislature in January 2016. IPOs allow victims of dating violence and abuse to petition the court for protection against their abusers. KRS[3] 456.030(1). IPOs are governed by KRS Chapter 456, which generally mirrors the provisions in KRS Chapter 403, the legislation pertaining to domestic violence orders ("DVOs").

Much like the process to obtain a DVO, "if a court finds by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur, the court may issue an interpersonal protective order." KRS 456.060(1). "The preponderance of the evidence standard is met when 'sufficient evidence establishes the alleged victim was more likely than not to have been a victim' of dating violence and abuse, sexual assault, or stalking." *Jones v. Jones*, 617 S.W.3d 418, 423 (Ky. App. 2021) (citing *Dunn*, 546 S.W.3d at 580 (applying the preponderance of the evidence standard in the context of issuance of a domestic violence order)).

---

[3] Kentucky Revised Statutes.

"Dating violence and abuse" is defined as "[p]hysical injury, serious physical injury, stalking, sexual assault, strangulation, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault occurring between persons who are or have been in a dating relationship." KRS 456.010(2)(a). A "dating relationship" is "a relationship between individuals who have or have had a relationship of a romantic or intimate nature. It does not include a casual acquaintanceship or ordinary fraternization in a business or social context." KRS 456.010(1).

Brad argues generally that the family court's findings of fact are clearly erroneous and not supported by substantial evidence. The family court determined both Brad's relationships with Heather and Danielle qualified as dating relationships, and that Brad's actions constituted domestic violence and abuse by the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault. Brad argues the family court ignored evidence that seriously impeached the credibility of both Heather and Danielle.

Several text messages and social media posts were entered into evidence, many of which call into question the credibility of *all* the parties. Based on the totality of the testimony as well as the evidence introduced, the family court determined that Heather's and Danielle's testimonies were more credible. Specifically, the family court wrote: "As to Mr. Sears, the Court did not find him

-11-

credible. The Court felt he underplayed the relationship he had with Ms. Bryant and minimized his actions. The Court finds that he did[] prompt the complaint against Ms. Guminski and the texts clearly show he encouraged it directly. In addition, to think that Ms. Bryant would make a complaint against Ms. Guminski without prompting would be too coincidental for the Court to believe it."[4]

Brad repeatedly testified he did not have a relationship with Heather. This testimony was one of the reasons the family court did not deem Brad to be credible. While he claims they never had a relationship, Brad clearly admits he and Heather had a sexual relationship, stayed over at each other's homes, and met each other's children. This illustrates a dating relationship, and the family court's finding of such was not clearly erroneous.

Both Heather and Danielle testified that Brad's angry rants were always directed at previous romantic partners or those who he believed had crossed him in some way. They agreed they were not afraid of him until they became members of that category. They had heard him make threats against those individuals. Both testified he showed them weapons, despite his insistence that he no longer owned any firearms.

Brad's behavior indicated a fixation on those who he perceived had slighted him. The family court believed that Brad had influenced Heather to file a

---

[4] Order of November 15, 2024, Record at 61-64 on No. 24-D-00099-001.

complaint against Danielle, even though he and Danielle had not been in a relationship for several months. This, coupled with the threats he vocalized against others, made it not unreasonable for Danielle to fear that Brad would escalate his behavior.

The filing of the complaint against Danielle alone would not have been adequate to sustain the protective order. Likewise, the threats Brad made and the anger he displayed while in a relationship with Danielle may have been too remote in time to justify the granting of the IPO. But the totality of the circumstances supports the family court's conclusion that Brad posed a legitimate threat of domestic violence, as defined, against Danielle.

Both Heather and Danielle admit Brad never physically harmed them. But an infliction of fear of imminent physical injury does not require a finding that physical injury has occurred. *Hohman v. Dery*, 371 S.W.3d 780, 782-83 (Ky. App. 2012). Much like in *Hohman*, Heather and Danielle described Brad's behavior as being full of rage, irrational, and "terrifying." This behavior, combined with his threats made against others similarly situated to themselves, caused them to fear him.

The family court indicated in its order, and we are inclined to agree, that Brad's actions constituted a "pattern of control and abuse." This is not a case where one isolated event occurred; both Danielle and Heather testified Brad often

made threats against those whom he perceived to have disrespected him, and that included previous romantic partners.  They did not have a reason to fear he would harm them until they too became a part of that category.  This type of pattern was described by the United States Supreme Court:

> "DOMESTIC Violence" is not merely a type of "violence"; it is a term of art encompassing acts that one might not characterize as "violent" in a nondomestic context. . . .
>
> Minor uses of force may not constitute "violence" in the generic sense. . . .  But an act of this nature is easy to describe as "domestic violence," when the accumulation of such acts over time can subject one intimate partner to the other's control.

*United States v. Castleman*, 572 U.S. 157, 165-66, 134 S. Ct. 1405, 1411-12, 188 L. Ed. 2d 426 (2014).

Brad makes much of the fact that Danielle and Heather filed their petitions at the same time.  He believes this is evidence that this is a smear campaign against him, and so their allegations should not be taken seriously.  Even if we believe his assertion that filing their petitions together is evidence of retaliation against him, it does not negate his actions toward them.  As the saying goes, two things can be true at once.[5]

---

[5] While not a quote, this expression has been attributed to F. Scott Fitzgerald from his essay entitled *The Crack Up*.

-14-

Brad might credibly argue that this case illustrates a close call. Even so, "Kentucky courts have liberally construed our [domestic violence statutes] in order to afford relief. [The statute] mandates that the domestic violence statutes be interpreted to [a]llow victims to obtain effective, short-term protection against further wrongful conduct in order that their lives may be as secure and as uninterrupted as possible." *Boone v. Boone*, 501 S.W.3d 434, 440 (Ky. App. 2016) (internal quotation marks omitted).

When reviewing the issuance of a protective order, "the test is not whether we would have decided it differently, but whether the court's findings were clearly erroneous or that it abused its discretion." *Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008). We must give great deference to the trial courts as the finders of fact. "It has long been held that the trier of fact has the right to believe the evidence presented by one litigant in preference to another." *Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996). "The trier of fact may take into consideration all the circumstances of the case, including the credibility of the witness[es]." *Id.*

"A family court operating as finder of fact has extremely broad discretion with respect to testimony presented, and may choose to believe or disbelieve any part of it. A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not

permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous." *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007). It is within the circuit court's purview to weigh the credibility of the witnesses. *Baird v. Baird*, 234 S.W.3d 385, 388 (Ky. App. 2007). Considering all the evidence, it was not unreasonable for the family court to have chosen to believe Heather and Danielle more than Brad.

## CONCLUSION

The factual findings of the family court are supported by substantial evidence and are not clearly erroneous. The family court did not abuse its discretion in issuing the IPOs in favor of the Appellees. There being no reversible error, we AFFIRM the Orders of the McCracken Family Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Richard L. Walter
Paducah, Kentucky

BRIEFS FOR APPELLEES:

Katina B. Miner
Bowling Green, Kentucky